**[Cite as *Meeker v. Nolt*, 2026-Ohio-2644.]**

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BROWN COUNTY

|  |  |  |
|---|---|---|
| JIM B. MEEKER, | : | CASE NO. CA2026-02-005 |
| Appellant, | : | |
| vs. | : | <u>OPINION AND</u><br><u>JUDGMENT ENTRY</u><br>7/13/2026 |
| LAMAR NOLT, et al., | : | |
| Appellees. | : | |
|  | : | |

CIVIL APPEAL FROM BROWN COUNTY COURT OF COMMON PLEAS
Case No. 2024-0355

Schroeder Law Group, and James E. Schroeder, for appellant.

Martin, Browne, Hull & Harper, P.L.L., and Gregory R. Flax, Benjamin D. Noll, and D. Alexander Niswonger, for appellees.

_____

# **O P I N I O N**

**PIPER, J.**

{¶ 1}   Jim B. Meeker appeals the Brown County Court of Common Pleas' decision granting summary judgment in favor of appellees Lamar, Lorraine, and Irwin Nolt

(collectively, "the Nolts").[1] Meeker contends that restrictive covenants remain in effect on the Nolts' property that bar them from operating a commercial egg-production facility, and questions of material fact remain as to whether the facility is an anticipated private nuisance. We conclude that the covenants remain in effect, but do not prohibit operation of an egg-production facility, and such a facility is not an anticipated nuisance. We therefore affirm the trial court's judgment as modified.

## I. Factual and Procedural Background

{¶ 2} In early 2004, Hall Ring Farm Partnership (hereinafter "Hall Ring") subdivided its 136-acre farm in the unincorporated territory of Jefferson Township, Brown County, into three parcels of land: 45.214 acres, 71.427 acres, and 19.855 acres. On February 12, 2004, Hall Ring conveyed the 45.214-acre parcel to Malcolm Lynn Truesdell and Arlene F. Day with certain covenants restricting the use of the land:

- "No swine, commercial dog kennels or game chickens shall he permitted. Large domestic farm animals (including but not limited to horses, cattle, sheep, goats and llamas) are permitted."

- "No noxious or offensive trade shall be carried out on any lot, nor shall anything be done thereon which may become an annoyance or nuisance, or on an occasion which will or might disturb the peace, comfort or serenity of the neighborhood."

- "No nuisance or obnoxious conditions shall be maintained on the property, including but not limited to, junk, scrap, paper, or debris of any kind or other unsightly condition. No lot shall be used or maintained as a dumping ground for rubbish or trash. Garbage, trash or other waste shall be kept in sanitary containers and all incinerators or other devices for the storage or disposal of such materials shall be kept in a clean and sanitary condition. Storing unlicensed motor vehicles on the property at any time is prohibited."

---

1. Pursuant to Loc.R. 6(A), we have sua sponte removed this appeal from the accelerated calendar. *In re M.D.D.*, 2010-Ohio-326, ¶ 1, fn. 1 (12th Dist.).

The recorded covenants attached to the 45.214-acre deed further specified that all residences shall be "stick built" with a minimum 1500 sq. ft. of living space, trailer homes are prohibited on the premises, and "[a]ll remaining tracts of land on this farm will have the same deed restrictions when transferred."

{¶ 3} Hall Ring conveyed the remaining 71.427-acre parcel to Hall-Ring, LLC on March 3, 2004, and the 19.855-acre parcel to Randy Meeker (Jim Meeker's brother) on May 19, 2004. Both conveyances were recorded with substantially the same restrictive covenants as the 45.214-acre deed and provided that "[t]hese restrictions shall be deemed to run with the land." The parcels were then conveyed over the years to different owners with the same covenants.

{¶ 4} In 2010, Jim Meeker purchased the 19.855-acre parcel. Since then, he has used the parcel to farm corn and soybeans. In 2020, the Nolts purchased 71.3 acres of land derived from the 71.427-acre parcel, with the same restrictive covenants in place. In early 2024, the Nolts contracted with Granite Ridge Poultry LLC to develop a 64,000-layer commercial egg-production facility and recorded a "Release of Protective Covenants and Restrictions" signed solely by Hall Ring Farm Partnership. No construction or operation has begun.

{¶ 5} In May 2024, Meeker filed a lawsuit against the Nolts seeking a declaratory judgment that the "Release of Protective Covenants and Restrictions" was null and void and should be removed from the Brown County Recorder's records. He also sought to enjoin the Nolts from constructing or operating a commercial egg-production facility on the property, alleging that such use would violate the restrictive covenants and constitute a private nuisance.

{¶ 6} The parties filed cross-motions for summary judgment. On December 16, 2025, the magistrate granted the Nolts' motion and denied Meeker's. In the same entry,

the trial court journalized and approved the magistrate's decision, stating that it would become the court's order in 14 days unless timely objections were filed. Meeker did not object within that period. Instead, on January 5, 2026, he moved for an extension of time, which the trial court granted, and he filed his objections on January 12, 2026. In response, the Nolts argued that the trial court lacked authority to grant the extension because the magistrate's decision became a final judgment on December 30, 2025, thereby terminating the court's jurisdiction. On February 18, 2026, the trial court issued a decision that considered Meeker's objections, overruled them, and adopted the magistrate's decision.

{¶ 7}   Meeker now appeals from this decision, raising four assignments of error for our review.

## II. Legal Analysis

Timeliness of Objections and Waiver

{¶ 8}   Before addressing the merits, we first consider the Nolts' procedural argument. They contend that Meeker failed to file timely objections to the magistrate's decision and has therefore waived all but plain error on appeal. According to the Nolts, the magistrate's decision became a final judgment on December 30, 2025, which divested the trial court of jurisdiction to grant Meeker additional time to object and rendered the court's February 18, 2026 decision on those objections void. We disagree.

{¶ 9}   As this court has explained, "a trial court has the discretion to consider objections filed after the 14-day time limit of Civ.R. 53(D) *so long as the trial court has not entered a final judgment*." (Emphasis in original.) *Learning Tree Academy, Ltd. v. Holeyfield*, 2014-Ohio-2006, ¶ 15, fn. 2. Once the trial court enters a final judgment, its jurisdiction ends, and it may no longer consider untimely objections to a magistrate's decision. *Id.* at ¶ 17.

{¶ 10} A judgment generally is a pronouncement that determines the matters submitted to the court. *State ex rel. Curran v. Brookes*, 142 Ohio St. 107 (1943). The adoption or rejection of a magistrate's decision is not itself the matter submitted to the court; rather, the magistrate's decision is an additional resource the court may use in resolving the issues before it. *In re Adoption of S.R.A.*, 2010-Ohio-4435, ¶ 22 (10th Dist.), citing *In re Cox*, 2005-Ohio-3899, ¶ 31 (11th Dist.). A court adopting a magistrate's decision must also enter judgment. *In re P.L.H.*, 2020-Ohio-7029, ¶ 15, fn. 2 (2d Dist.) ("We caution that to be considered final, such a combined magistrate's decision and judge's order must actually contain the court's required judgment language. Merely appending the judge's signature onto a magistrate's decision, without judgment language, is inadequate"); Civ.R. 53(D)(4)(a), (e). A "judgment" means "a written entry ordering or declining to order a form of relief, signed by the judge, and journalized on the docket of the court." Civ.R. 54(A).

{¶ 11} Here, on December 16, 2025, the trial court journalized the magistrate's decision and stated the following: "It is hereby ordered that the attached Magistrate's Decision filed in this matter is approved and shall be the Order of the Court effective fourteen (14) days after the filing of the Decision of the Magistrate unless objections to the Decision of the Magistrate are appropriately and timely filed." The trial court did not subsequently order or decline to order relief before Meeker sought leave to file untimely objections.

{¶ 12} We conclude that the December 16, 2025 entry was not a final judgment because it was not a clear pronouncement of judgment ordering or declining to order a form of relief. Instead, it merely "approved" the magistrate's decision and expressed a future intent to adopt it as the court's order after 14 days. "[F]or a trial court's order to be considered final . . . the court must still enter its own judgment resolving a case, rather

than simply adopting a magistrate's decision, and the court must resolve the matter in a way that allows the parties to understand their rights and obligations." *P.L.H.* at ¶ 12. The December 16, 2025 entry did not resolve the substantive issues before the court— whether the covenants applied to the Nolts' property, whether they prohibited egg production, and whether the proposed facility would constitute a private nuisance.

{¶ 13} Accordingly, the trial court retained jurisdiction and acted within its discretion in considering Meeker's untimely objections. Meeker therefore did not waive his right to appeal, and we proceed to the merits.

## Meeker's Arguments

{¶ 14} Meeker's four assignments of error collectively challenge the trial court's findings of fact and conclusions of law in denying his motion for summary judgment and granting summary judgment to the Nolts. Meeker argues that this court should (1) declare the "Release of Protective Covenants and Restrictions" null and void because it was only signed by the former owners of the property and not by the current beneficiaries of the covenant, (2) find the covenant restricts the Nolts from operating a commercial egg-production facility on their property, (3) enjoin the Nolts from constructing and operating such a facility, and (4) remand the matter for further proceedings as there are genuine issues of material fact whether the proposed egg facility will diminish the value and enjoyment of Meeker's property.

{¶ 15} Upon reviewing Meeker's arguments, we find that the restrictive covenants remain in effect on the Nolts' property, however they do not prohibit the construction and operation of a commercial egg-production facility, and this planned facility does not constitute an anticipated private nuisance.

## Standard of Review

{¶ 16} "An appellate court's examination of a trial court's decision to grant

- 6 -

summary judgment is subject to de novo review." *Auto Recyclers of Middletown, Inc. v. Stein, LLC*, 2025-Ohio-414, ¶ 24 (12th Dist.). De novo review means that this court uses the same standard that the trial court should have used and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial. *Id*.

Release of Covenants

{¶ 17} "Restrictive covenants are covenants running with the land, intended to limit the grantee's use of the land to specified purposes, with the object of protecting the interests of all landowners in the same allotment or community." *Fettro v. Rombach Ctr., LLC*, 2013-Ohio-2279, ¶ 11 (12th Dist.). In determining who may enforce a restrictive covenant, the Ohio Supreme Court held that:

> [T]he answer to this question lies not in the ascertainment of artificial and arbitrary lines drawn upon a plat book but in the determination of the intention of the parties to be gained from the language of the instrument and the surrounding circumstances. The question to be asked is: For whose benefit was the restriction imposed?
>
> If the restrictive covenant was enacted for the benefit of the one seeking to enforce it, he may do so, but the burden is upon him to show that such covenant restricting the use of the lands of another was intended to be for his benefit, and that he has an equitable interest in the other person's adherence to the covenant.

*Berger v. Van Sweringen Co.*, 6 Ohio St.2d 100, 102 (1966). Enforcement does not depend upon the existence of a uniform general plan or building scheme, but courts will consider these circumstances in determining the intent of the parties. *Id.* at 103.

{¶ 18} Here, Hall Ring subdivided its 136-acre farm into three parcels and imposed substantially similar restrictive covenants on each parcel, governing permitted agricultural activities, land use, and the types of residences that could be constructed. The covenants recorded with the first conveyance on February 12, 2004, expressly provided that "[a]ll remaining tracts of land on this farm will have the same deed restrictions when

transferred." Consistent with that language, each subsequent conveyance of property derived from the original 136-acre Hall Ring farm included the same restrictive covenants.

{¶ 19} From this language and the surrounding circumstances, we conclude that the subsequent owners of the subdivided Hall Ring farm were intended beneficiaries of the restrictive covenants. Meeker is one such owner and therefore may maintain an action to prevent cancellation and enforce the covenants on the Nolts' property. See *Berger*, 6 Ohio St.2d at 100, paragraph one of the syllabus. Because the covenants were imposed for the benefit of the current owners of the subdivided parcels, Hall Ring could not unilaterally extinguish them.[2] Rather, all current beneficiaries must agree to release the restrictive covenants. *See Id.*; *See also JDS So Cal, Ltd. v. Ohio Dept. of Natural Resources*, 2018-Ohio-1159, ¶ 45 (10th Dist.) ("Termination by release is based on fundamental principles of contract law, as a person entitled to enforce a promise may relieve the promisor of his or her obligation.").

### Interpretation of Restrictive Covenants

{¶ 20} Restrictions on land use are disfavored in Ohio and are to be strictly construed. *Reinsmith v. Curtis*, 2015-Ohio-573, ¶ 14 (12th Dist.). Ordinary rules of contract construction are used to construe a restrictive covenant. *Summit Pointe Home Owners Assn., Inc. v. Neslen*, 2013-Ohio-2643, ¶ 14 (12th Dist.). Thus, covenants should be construed consistent with the parties' intent. *Id*. To determine such intent, courts must look to the language of the covenant itself. *Id*.

{¶ 21} The language should be given its common, ordinary meaning in light of the circumstances surrounding the creation of the covenant. *Id*. If the language is unambiguous, the restriction must be enforced as written. *Todd Dev. Co., Inc. v. Morgan*,

---

2. We note that the Nolts have all but conceded the issue, having offered no argument in their brief as to why the Hall Ring release should have effectively extinguished the covenants.

2006-Ohio-4825, ¶ 32 (12th Dist.). While a court has the authority to interpret the language of a restrictive covenant to determine the intent of the drafters, it cannot rewrite a covenant to create new restrictions. *Reinsmith* at ¶ 15.

{¶ 22} Here, the restrictive covenants expressly prohibit keeping "swine, commercial dog kennels or game chickens." They also broadly prohibit any "noxious or offensive trade" that would "disturb the peace, comfort or serenity of the neighborhood," as well as any "nuisance or obnoxious condition." Meeker argues that a commercial egg-production facility housing thousands of chickens is substantially similar to the prohibited uses because it would produce comparable odors and noises. He further contends that the restriction on "swine, commercial dog kennels or game chickens" was intended to bar intensive commercial livestock operations and that the proposed egg-production facility therefore qualifies as a noxious or offensive trade prohibited by the covenants. We disagree.

{¶ 23} The specific restrictions on swine, commercial dog kennels, and game chickens appear in a paragraph separate from the provisions addressing noxious or offensive trades, nuisances, and obnoxious conditions. Nothing in the covenant language suggests that these animal restrictions were intended as a nonexhaustive list of prohibited animals, trades, or conditions. Moreover, while the covenants expressly permit "Large domestic farm animals" and provide examples of such animals, they do not define, restrict, or categorically prohibit small farm animals.

{¶ 24} The interpretive canon *expressio unius est exclusio alterius* is instructive here: the expression of one thing implies the exclusion of others. As the trial court found, the term "game chickens" refers to chickens raised for cockfighting. By expressly prohibiting only "game chickens," and not chickens generally, the covenants indicate that other types of chickens, including chickens kept for egg production, are not prohibited.

{¶ 25} The nuisance and obnoxious-condition provisions appear primarily directed at waste dumping, debris, and unsightly or unsanitary conditions. By contrast, the restrictive covenants expressly contemplate agricultural use of the land and the keeping of farm animals. Agriculture includes poultry husbandry and the production of poultry and poultry products. *See* R.C. 519.01. We therefore decline to read the broad prohibitions on "noxious or offensive trades" or "nuisances or obnoxious conditions" as barring a commercial egg-production facility per se.

{¶ 26} It is doubtful that the original drafters intended to prohibit the keeping of egg-laying chickens on this farmland, and we decline to infer that commercial-scale egg production is prohibited by the covenants. Ultimately, this court may not rewrite the covenants to impose additional restrictions barring the keeping of egg-production chickens or the operation of a commercial egg-production facility. *See Reinsmith*, at ¶ 21.

Anticipatory Private Nuisance

{¶ 27} Although the restrictive covenants do not proscribe a commercial egg-production facility, Meeker also brings a separate claim under the common law tort theory of a private nuisance. We find his claim speculative and unsupported by the factual evidence.

{¶ 28} A "private nuisance" is a nontrespassory invasion of another's interest in the private use and enjoyment of land. *Nithiananthan v. Toirac*, 2015-Ohio-1416, ¶ 32 (12th Dist.). In order for a private nuisance to be actionable, the invasion must be either (a) intentional and unreasonable or (b) unintentional but caused by negligent, reckless, or abnormally dangerous conduct. *Id*. A court may enjoin a threatened or anticipated nuisance when it is presented with clear and convincing evidence that a nuisance will necessarily result from a contemplated act. *Brackett v. Moler Raceway Park, LLC*, 2011-Ohio-4469, ¶ 17 (12th Dist.). However, "if the act or thing sought to be enjoined may or

may not become a nuisance, depending on the use or manner of its operation, or other circumstances, equity will not interfere." *Id.*

{¶ 29} As discussed above, poultry husbandry and the production of poultry and poultry products are ordinary agricultural activities. Like other forms of animal husbandry, keeping poultry for egg production outside municipal limits is not a nuisance per se. Rather, it becomes a nuisance only when operated in a manner that annoys or injures private persons or injures property. *See Weber v. Bd. of Health*, 148 Ohio St. 389, 400 (1947) (a hog farm or piggery located outside municipal corporation limits is not a nuisance per se); *See also Park v. Langties*, 1991 Ohio App. LEXIS 4903, at *3 (11th Dist. Oct. 11, 1991) (holding cattle feedlot was not a nuisance where there was no evidence that the defendants were not using acceptable agricultural practices, or that there is any material change in the general agricultural nature of the area, even though it "may have added to the odor in the area").

{¶ 30} The proposed egg-production facility has not yet been constructed and would be located somewhere on the Nolts' 71.3-acre parcel. The present record does not establish what odor, noise, or other environmental impact, if any, the facility would have on surrounding parcels. Meeker conceded that the facility would not affect his current use of his property for farming corn and soybeans, and neither Meeker nor his expert could quantify any anticipated diminution in property value. In addition, the contract between the Nolts and Granite Ridge Poultry requires the Nolts to follow generally accepted agricultural practices. Although the facility may or may not become a nuisance in the future, Meeker's anticipatory private nuisance claim fails because he has not presented

clear and convincing evidence that a nuisance will necessarily result. *Brackett*, at ¶ 17.[3]

## III. Conclusion

{¶ 31} Meeker's first assignment of error is sustained, and his remaining assignments of error are overruled. The trial court's judgment is modified to reflect that Hall Ring's unilateral "Release of Protective Covenants and Restrictions" was ineffective and that the covenants and restrictions recorded in 2004 remain in effect on the Nolts' land.[4] Nevertheless, because those covenants and restrictions do not prohibit raising chickens for egg production, and because Meeker failed to present clear and convincing evidence that a nuisance will necessarily result from the operation of an egg-production facility, the trial court did not err in granting summary judgment in favor of the Nolts.

{¶ 32} Judgment affirmed as modified.

BYRNE, P.J., and HENDRICKSON, J., concur.

---

3. We note that the magistrate's decision adopted by the trial court states that R.C. 3767.13(D) entitles the Nolts to operate their egg-production facility so long as they follow generally accepted agricultural practices, and conduct their activities in such a manner so as not to have a substantial, adverse effect on the public health, safety, or welfare. This is only true for statutory nuisance claims brought under R.C. Chapter 3767. *See Moody v. Wiza*, 2007-Ohio-5356, ¶ 68. R.C. 3767.13(D) does not shield the Nolts from common law nuisance claims.

4. We need not order Hall Ring's "Release of Protective Covenants and Restrictions" removed from the Brown County records. The release terminates Hall Ring's interest in the restrictive covenants and any right Hall Ring may have had to enforce them, even though the covenants remain on the Nolts' property unless and until the other affected landowners release them.

# J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed as modified in the above Opinion.

It is further ordered that a mandate be sent to the Brown County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed 75% to appellant and 25% to appellee.

*/s/ Matthew R. Byrne, Presiding Judge*

*/s/ Robert A. Hendrickson, Judge*

*/s/ Robin N. Piper, Judge*